[No. S022173. Dec. 5, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
CLIFFORD STANLEY BOLDEN, Defendant and Appellant.

518

## COUNSEL

Jeanne Keevan-Lynch, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Ronald A. Bass, Assistant Attorney General, Joan Killeen and Frances Marie Dogan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—Defendant Clifford Stanley Bolden appeals from a judgment of death upon his conviction by jury verdict of one count of murder in the first degree (Pen. Code, § 187),[1] with the special circumstance of murder in the commission of robbery (§ 190.2, subd. (a)(17)(A)), and one count of robbery (§ 211), with use of a deadly weapon to commit both offenses (§ 12022, subd. (b)). The jury that returned these verdicts as to guilt and special circumstance also returned a penalty verdict of death for the offense of first degree murder. The trial court denied the automatic motion to modify penalty (§ 190.4, subd. (e)) and sentenced defendant to death.

This appeal from the judgment of death is automatic. (§ 1239, subd. (b).) We will affirm the judgment in its entirety.

### I. FACTS AND PROCEEDINGS

Henry Michael Pedersen was found dead in his apartment. He had been stabbed to death, and his body had been wrapped in a bedspread and placed in a bathtub. When last seen alive, Pedersen was in defendant's company, and defendant's fingerprints were found in Pedersen's apartment. When the police arrested defendant for Pedersen's murder, defendant had property belonging to Pedersen, and he was carrying a knife that was stained with human blood consistent with Pedersen's blood type.

### A. *Prosecution's Guilt Phase Case-in-chief*

On September 8, 1986, Pedersen, an unemployed accountant, lived by himself in the upper unit of a three-unit apartment building in San Francisco.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

During the early afternoon, he went to a bar called the Pendulum, where the bartender, Thomas Sherck, recognized him as a regular customer. In the gay community of San Francisco, the Pendulum was known as a bar where Black men could meet White men. Sherck also saw defendant in the bar that afternoon. Defendant had placed an advertisement in the personals section of a local newspaper describing himself as a "black body builder, sculptured rock hard" and offering his services as an escort and model.

Around 5:00 p.m., Pedersen returned to his apartment where he spoke to Wayne L. Frye, a friend who occupied the ground floor apartment in the same building. Pedersen left again a short time later.

Lawrence Weathers, another friend of Pedersen's, met Pedersen at the Pendulum between 5:00 and 6:00 p.m. Weathers saw Pedersen speak to defendant for 10 to 15 minutes. Pedersen left a short time later. Defendant followed and caught up with Pedersen, and the two continued walking together. Bruce Wertin, another bartender at the Pendulum, saw defendant there after 11:00 p.m., but Wertin was not acquainted with Pedersen and could not say whether Pedersen was there at that time.

That night, Frye heard Pedersen return to his apartment with another person between 11:00 p.m. and 1:00 a.m. Frye heard music being played in Pedersen's apartment and later he heard one person leave. Around 2:45 a.m., Bruce Wertin was waiting at a bus stop on Market Street when he saw defendant walking from the direction of Pedersen's apartment carrying an athletic bag. Wertin and defendant rode the same bus, and both got off at the corner of Market and Eighth Streets.

Around 6:00 p.m. on September 9, Frye went to Pedersen's apartment to investigate the sound of running water. After knocking and getting no response, he entered the apartment. In the bathroom, he found Pedersen's body in the bathtub, wrapped in a brown bedspread, with his head under the running faucet. Frye immediately contacted the police.

At the time of his death, Pedersen was 46 years old, stood five feet nine inches tall, and weighed 165 pounds. An autopsy of his body revealed that the cause of death was shock and hemorrhage caused by a stab wound to the back, just to the left of the center line and below the shoulder blade. This wound was five to six inches deep and five inches long, and it penetrated the lung and the spleen. There was also an L-shaped incised wound on Pedersen's chest, consisting of a vertical cut along the sternum and a horizontal cut along the ribs. Each of these cuts penetrated to the bone but not into the chest cavity. Pedersen's nose was fractured at the base and there was an

abrasion and redness along the bridge of the nose. These injuries could have been caused either by a blow or by falling against a hard object. There were no defensive wounds on the body. Blood taken from the body had an alcohol content of .36 percent.

Police investigators observed no signs of a struggle in the apartment. On the coffee table in the living room were an empty wine bottle and two glasses. When the investigators turned over the cushions on the couch, they saw that the center cushion was saturated with blood, and the two outer cushions each had blood spatters. Defendant's fingerprints were found on the wine bottle, on one of the wine glasses, and on the bathtub. A warrant was issued for defendant's arrest.

Defendant was arrested on September 11, 1986. The arresting officers found a doubled-edged knife in a black sheath strapped to defendant's leg, concealed by his pants and socks. The knife, which had a six-inch blade, could have been the weapon that killed Pedersen. Defendant's pockets contained a gold bracelet engraved with the initials HMP and one gold cuff link. In the hall closet of defendant's apartment, officers found a black athletic bag containing these items: a gold cuff link matching the one found in defendant's pocket, a camera, binoculars, a wristwatch, a coin issued in 1977 to commemorate the Silver Jubilee of Queen Elizabeth, and a plastic vial containing 50-cent pieces. The camera contained film; when this film was developed, the photographs included views of Pedersen's apartment building.

Pedersen's brother identified the camera found in defendant's apartment as one he had loaned to Pedersen. He identified the binoculars as those he had given to Pedersen around 1973. He said Pedersen usually kept the binoculars on the dining table or the coffee table in his apartment. He identified the plastic vial with 50-cent pieces as property that Pedersen usually kept on a bookcase in his bedroom.

Michele Garrison, one of Pedersen's former coworkers, identified the bracelet found in defendant's pocket as one she had caused to be engraved with Pedersen's initials and had given Pedersen around 1973. Kathryn Hendricks, a friend of Pedersen's, identified the gold cuff links, one of which was found in defendant's pocket and the other in defendant's apartment, and the binoculars found in defendant's apartment, as items belonging to Pedersen. She said Pedersen had used the binoculars when attending opera and ballet performances. Joseph Falardi, another friend of Pedersen's, also identified the camera, binoculars, and the vial with coins as property belonging to Pedersen. Marion Seitz, a friend and former coworker of Pedersen's,

identified the 1977 commemorative coin as one she had given Pedersen. She testified that she had attended a concert with Pedersen on September 7, 1986, the night before he was killed, and that during the concert Pedersen had used the binoculars that were found in defendant's apartment.

Debbie Madden, a police criminalist specializing in forensic serology, examined the knife defendant was carrying when arrested and found a dried stain on the blade where it entered the knife's hilt. She scraped off the dried material and, upon testing, determined that it was human blood. By further testing using the electrophoretic multisystem method, she determined that the blood was ESD type 2-1 and PGM type 1. This was consistent with Pedersen's blood and with the blood of 13 percent of the White population, but it was inconsistent with defendant's blood.

## B. *Defense Case at the Guilt Phase*

Duayne J. Dillon, a consulting criminalist, testified that his examination of the wine bottle and glasses found in Pedersen's apartment revealed no evidence that any of these objects had been wiped to remove fingerprints. On the wine bottle there was a mark indicating something had come in contact with the bottle, leaving a smudge, but the mark covered less than 3 percent of the bottle's surface. There were no marks on either wine glass consistent with wiping. Although more fingerprint powder adhered to one glass than to the other, this did not indicate that one of the glasses had been wiped. Rather, it indicated that there was more oil or other residue on the surface of the glass to which more powder adhered.

James Lord testified that he was a close friend of victim Pedersen. During the months of July to September 1986 Pedersen was not working. Pedersen frequented bars, including the Pendulum, in the Castro area of San Francisco. Defense counsel showed Lord a copy of a newspaper called the Bay Area Reporter in which defendant had advertised his services as a model or escort. Lord testified that the Bay Area Reporter was a newspaper that circulated primarily in the gay community. He knew of one occasion on which Pedersen had answered a similar newspaper advertisement.

Mary Elizabeth Reynolds testified she was the assistant manager of a clinical laboratory at a hospital. Her duties included quality assurance for clinical tests performed in the laboratory, including blood tests. She reviewed the testimony of prosecution criminalist Debbie Madden about the blood testing in this case, and particularly the test, known as the Ouchterlony species test, used to determine that there was human blood on the knife that defendant was wearing when he was arrested. She also reviewed the documentation that Madden had prepared for the Ouchterlony test. In Reynolds's

opinion, Madden's documentation and the procedures she used were improper in several respects. As a result, Reynolds formed the opinion that the result that Madden reported for this test was not scientifically reliable.

In argument to the jury, defense counsel questioned the sufficiency of the prosecution's evidence to prove beyond a reasonable doubt that defendant committed robbery and murder. Counsel argued that the forensic testing of the stain on the knife was scientifically flawed and unreliable, thus generating a reasonable doubt that defendant had killed Pedersen. Counsel further argued that even if the jury concluded that defendant was responsible for Pedersen's death, the prosecution's evidence was insufficient to prove that robbery was the motive for the killing. Referring to evidence indicating that Pedersen had invited defendant to his apartment, counsel suggested that the jury could reasonably infer that Pedersen gave his property to defendant in payment for defendant's services as a model or escort, or, alternatively, that defendant decided to take Pedersen's property only after Pedersen's death.

## C. *Guilt Phase Verdicts*

The jury returned verdicts finding defendant guilty of the charged offenses of robbery and murder, found the murder to be of the first degree, and found true the special circumstance allegation that the murder occurred during a robbery. The jury also found that defendant used a deadly weapon in the commission of the murder and the robbery.

## D. *Prosecution's Penalty Phase Case in Aggravation*

On January 3, 1979, defendant was living in San Francisco with a woman named Frances Ned. They were often homeless and slept on the streets. They frequently became drunk from fortified wine. Defendant practiced martial arts techniques in public parks. Around 2:30 p.m. that day, defendant and Ned encountered a man named Ernest Cole on Seventh Street between Mission and Market Streets. Defendant spoke with Cole. Although at trial Ned denied that she heard what Cole said, she had previously told police investigators that Cole offered defendant $20 to have sex with Ned and that defendant became angry because she was not a prostitute and defendant was very jealous. Defendant entered a liquor store and bought a bottle of wine, telling Ned that he hoped Cole would follow them. As they walked toward an alley, Cole caught up with them. Defendant, Ned, and Cole shared the wine as they continued walking. They stopped and defendant placed his left hand around Cole's face while he slashed Cole's throat with a machete that defendant kept under his coat. Cole died almost immediately from a deep wound to the neck that severed both arteries and airway.

The next day, around 10:00 a.m., Andrew Kitchen was walking from a neighborhood grocery store to the hotel where he lived in San Francisco when defendant stopped him and accused him of trying to "make" defendant's girlfriend. Kitchen understood that defendant was referring to Frances Ned. Kitchen told defendant that he had the wrong person, and he suggested they talk to Ned. They walked up the street to where Ned was standing. Kitchen asked Ned to tell defendant that Kitchen was not the person defendant was looking for, but Ned smiled and said he was the person. Defendant pulled out a machete and swung it at Kitchen, cutting the skin over a rib on his left side. Kitchen ran away and reported the incident to a police officer.

On May 4, 1979, defendant and Ned were in San Jose to visit Ned's children, who were in foster care. Around 4:00 a.m., they were walking in an alley in downtown San Jose when they encountered Cruz Ramirez, who asked Ned where she lived. Defendant and Ramirez exchanged words. Defendant pushed Ramirez down and stabbed him twice in the back with a knife that defendant carried in his waistband. Defendant took some money from Ramirez's pocket. Defendant and Ned went to St. James Park, where defendant discarded the knife. Ramirez died from a stab wound to the back penetrating the aorta and lung. A second stab wound penetrated the pancreas but would not by itself necessarily have been fatal. Ramirez's blood-alcohol content was .28 percent.

On September 8, 1979, around 2:30 a.m., Gausena Wijipayala was driving in San Francisco when he stopped to pick up two hitchhikers, defendant and Frances Ned, at the corner of Sixth and Market Streets. After four or five blocks, Ned said she wanted to go to the bathroom. When Wijipayala stopped the car, defendant pulled him out of the car and hit him in the face. Defendant threw him into some bushes and took his watch and $8 or $9 that he had in his shirt pocket. Wijipayala ran to the Transbay Terminal and reported the incident to police, who promptly located and arrested defendant nearby with Wijipayala's watch and $9 in his pockets.

The prosecution introduced evidence that defendant had sustained these prior felony convictions: On December 18, 1979, judgment was pronounced on defendant's convictions for robbery (§ 211) and possession for sale of a controlled substance (Health & Saf. Code, § 11351). On February 25, 1981, judgment was pronounced on defendant's convictions for voluntary manslaughter (§ 192) and robbery (§ 211), the victim of these offenses being Cruz Ramirez. On November 12, 1981, judgment was pronounced on defendant's conviction for the voluntary manslaughter of Ernest Cole. On October 23, 1984, judgment was pronounced on defendant's conviction for prison escape without violence (§ 4530, subd. (b)).

## E. *Defense Penalty Phase Case in Mitigation*

For its case in mitigation, the defense presented evidence of defendant's life history. Gretchen White, a clinical psychologist, and Harry Z. Coren, a psychiatrist, provided expert opinions on how certain aspects of defendant's history had affected his development.

Defendant's parents met in Charleston, South Carolina, shortly after World War II, and they married in 1947. Defendant's father had served about five years in the United States Marine Corps during the war, with extensive combat experience in the Pacific. After the marriage, they lived in Summerville, South Carolina. Defendant's father did odd jobs but never held steady employment. Defendant's mother did housecleaning and other domestic work. Defendant was born in 1954, the second of five children born of the marriage. He had an older brother Paul, a younger brother Thurgood, and two younger sisters, Paulette and Vera.

Defendant's father was an alcoholic who beat defendant's mother when intoxicated. He was very jealous. Sometimes he made his children stand in a line against a wall while he beat their mother. Defendant had a severe stutter as a child, probably accompanied by facial grimaces as he attempted to get his words out. Defendant's father was embarrassed by this and did not take defendant with him on outings when he took defendant's older brother and younger sister Paulette. Defendant felt ignored and rejected by his father, and as a result he felt like a failure, worthless.

In July 1961, when defendant was almost seven years old, defendant's mother separated from his father after he threatened to kill her with a butcher knife. Defendant's mother moved with all the children to Hillsborough, North Carolina, where at first they lived in a small two-bedroom house with defendant's aunt and her husband and three children. A few months later, defendant's mother moved with her children into their own two-bedroom house, where they remained throughout the rest of defendant's childhood. Defendant never saw his father again.

Defendant's mother joined the congregation of a local Baptist church, where she taught Sunday school. Defendant and her other children attended Sunday school and church services and sang in the choir. Defendant had a good singing voice and did not stutter when he sang. Defendant was a quiet, shy child, with only a few friends. Other children teased him because of his stuttering. He was very good at drawing. At a young age, defendant announced that he wanted to be strong, and he began his own program of body building. He also developed a consuming passion for karate and other

martial arts and taught himself, working with fantastic intensity. He did well in school and caused no problems for the teachers. He was not involved in any delinquent behavior.

When defendant was around 10 years old, his mother took him to a psychologist or psychiatrist because of his stuttering, his persistent bed-wetting, and his quiet, withdrawn habits. She was told that he would probably grow out of these difficulties, and no treatment or therapy was provided.

Defendant dropped out of high school in 1973, a few months before he was scheduled to graduate. In February 1975, after a series of short-term jobs as a janitor and brickmaker or bricklayer, defendant enlisted in the Marine Corps.

Defendant did well during training camp, and his letters to his mother during that period showed his enthusiasm for military service and his idealism. After he completed his training, defendant was sent to the Philippines. During combat training there, defendant broke his kneecap and underwent two operations to repair it. According to Psychologist White, this injury was devastating for defendant, because it destroyed his self-image as someone who was invincible. Apparently defendant was no longer considered fit for combat duty and was assigned to desk jobs. Defendant's behavior deteriorated, and he was disciplined for being absent and being disrespectful to officers. He also formed a relationship with a Filipino woman who was 18 years older than he was, and he contracted syphilis. While in the Philippines, defendant began to speak with a Caribbean or Jamaican accent as a final technique to master his stuttering and also because it had a certain status value. In September 1976, he was discharged "under honorable conditions."

Defendant had no male figure to help him deal with disappointment and to restructure his life. Feeling too ashamed to return to the family home in North Carolina, defendant came to San Francisco, where he met and began living with Frances Ned, who was 10 years older than defendant and also had a knee injury. They frequently slept on the streets and engaged in heavy alcohol consumption. According to Psychiatrist Coren, the alcohol abuse may have been an attempt to self-medicate for depression. Defendant was jealous and overprotective of Ned. Defendant continued his bodybuilding exercises and martial arts training. According to Coren, defendant feels a powerful need to protect women.

In 1980, after his conviction for the voluntary manslaughter of Cruz Ramirez, defendant began serving a prison sentence. Around three months

after entering prison, defendant had two of his fingers accidentally cut off by a power saw in the prison woodshop. According to Psychologist White, this event further weakened his self-image as a strong and indestructible person.

In 1983, while housed at the California Men's Colony in San Luis Obispo, defendant worked in the hospital there. Doralee King, who was then a supervising nurse, testified that defendant was an "exceptional worker" who was "liked by staff and peers." Defendant returned to work at the prison hospital in 1985, and he again received very positive evaluations for his work performance.

In 1984, while in a prerelease program, defendant walked away from the prison. He was quickly recaptured in the town nearby. According to Psychologist White, defendant's nonviolent escape, with little or no effort to avoid recapture, probably indicated a subconscious desire to remain in the structured prison environment, a feeling that he was not ready to rejoin society.

When defendant was released from prison in 1986, he returned to San Francisco, where he met and began living with Andre Montgomery, who worked as a female impersonator at a nightclub. Unable to find other work, defendant began to do nude modeling for magazines and advertised his services as an escort. Defendant enjoyed having people admire his body, but he was ashamed of the sexual aspect of his work.

In addition to describing defendant's childhood, defendant's mother, his sister Paulette, his brother Thurgood, his aunt Bernice White, his cousin Phillip White, and his cousin Bobby Brown all expressed their love for defendant and asked the jury to spare his life.

Shortly before the trial in this case, Myla Young, a clinical psychologist, administered three different tests to defendant to measure his intelligence. His performance was consistent, indicating intelligence in the low average range, with an IQ of around 85. This was significantly lower than at the time of his admission to the Marine Corps, when he tested in the average range, with an IQ of around 100. Young also administered 15 standardized neuro-psychological tests to determine brain impairment. These tests showed mild organic impairment in brain functions relating to short-term verbal memory, emotional control, inhibition of behavior, understanding of behavioral con-sequences, and planning. These results are consistent with various causes, including chronic drug or alcohol abuse or a disease such as syphilis. To determine whether defendant has a mental disorder, Young administered standardized tests, including the Rorschach and the Minnesota Multiphasic

Personality Inventory (MMPI). The results of these tests revealed no major mental disorder, but they were consistent with chronic depression. Defendant does not meet the criteria for antisocial personality disorder because he manifested no antisocial behavior before age 15, and he did not demonstrate an inability to form attachments. Indeed, Young concluded, defendant appears to have the opposite problem: he forms attachments that are too intense and overwhelming.

In 1987, Gabriel Baltes, a member of the Benedictine order, met defendant in jail while defendant was awaiting trial for the murder of Pedersen. Baltes visited the jail to provide spiritual guidance and comfort to inmates. He spoke with defendant for approximately an hour twice a week for two years and formed a close and brotherly relationship with defendant.

Freedonia Woodard met defendant in September 1989 when her son was in jail on a murder charge. Defendant befriended her son, lifted his spirits, and helped him prepare for state prison. Defendant also helped her deal with her son's situation. At the time of trial, they continued to talk on the phone every day.

Two officers who worked at the jail during the same period, Robert Cooper and Rick Jackson, testified that defendant was a "model prisoner," very respectful and friendly to the jail staff.

James Park, a retired prison administrator, testified about the very high level of security at prisons housing prisoners serving sentences of life without possibility of parole.

## II. ISSUES RELATING TO JURY SELECTION

### A. *Rulings on Challenges for Cause*

Defendant contends that by excusing four prospective jurors for cause on the prosecutor's challenges, the trial court violated his rights to a fair trial and to an impartial jury guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

#### 1. *Voir dire responses of Prospective Jurors G.R., D.H., M.W., and R.R.*

Prospective Juror G.R. said she was philosophically opposed to the death penalty. Asked by the court whether she would always vote for life without possibility of parole, regardless of the evidence presented, she at first said

she did not know the answer to that question. "Whether or not in good conscience I could vote for the death penalty, I truly can't tell you at this point." Asked by defense counsel whether she could consider both penalties, she said: "I think I could do that. I cannot tell for sure until I'm in that situation." Addressing the court, she said: "What I'm trying to say is I truly don't know what I would do faced in a situation . . . . I truly don't know, and I've tried to say that I really do have a gut level reaction against the death penalty." "I can tell you I have a gut reaction against the death penalty. I truly do." Asked again by the court if she could vote for the death penalty if the evidence indicated it was appropriate, she said: "I think I would have to say in that situation, that I can't—I don't know what I would do, but I cannot in good conscience tell you that I know that I could impose it because I don't know that I could impose it at this point." The court granted the prosecutor's challenge for cause.

On examination by the court, Prospective Juror D.H. said: "I couldn't vote for the death penalty." On further question by the court, she said: "I would not impose the death penalty." On voir dire by the prosecutor, she said: "It would be a very difficult thing for me to do. I perhaps would be biased against the death penalty." She added: "Naturally, the evidence is what I would go on, but, the death penalty, it's very questionable whether I could vote for it." The court granted the prosecutor's challenge for cause.

On examination by the court, Prospective Juror M.W. said: "I have mixed feelings about the death penalty, Your Honor." Asked by the court if she could vote for the death penalty if she felt it appropriate, she answered: "I don't think so." Asked by the prosecutor if she could vote for the death penalty if convinced it was appropriate, she said: "I don't know. I have to hear all the evidence." The court granted the prosecutor's challenge for cause.

On examination by the court, Prospective Juror R.R. said: "I am opposed to the death penalty." On voir dire by defense counsel, she said: "I don't think I could find the death penalty ever appropriate." The court granted the prosecutor's challenge for cause.

2. *Analysis*

██ Under both the federal and state Constitutions, a sentencing jury in a capital case must be impartial. (*People v. Williams* (1997) 16 Cal.4th 635, 666-667 [66 Cal.Rptr.2d 573, 941 P.2d 752]; see also *Morgan v. Illinois* (1992) 504 U.S. 719, 726-728 [112 S.Ct. 2222, 2228-2229, 119 L.Ed.2d 492].) The trial court may excuse for cause a prospective juror who on voir

dire expresses views about capital punishment, either for or against, that "would 'prevent or substantially impair' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887], quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841].) ■ On appeal, we will uphold a trial court's ruling on a challenge for cause by either party "if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." (*People v. Mayfield* (1997) 14 Cal.4th 668, 727 [60 Cal.Rptr.2d 1, 928 P.2d 485]; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 987 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Crittenden, supra,* 9 Cal.4th at p. 122; *People v. Mincey* (1992) 2 Cal.4th 408, 456-457 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

■ Applying these standards, we uphold the excusals for cause. The responses of Prospective Jurors D.H. ("I would not impose the death penalty") and R.R. ("I don't think I could find the death penalty ever appropriate") indicate unequivocally that their death penalty views would have prevented or substantially impaired their performance of the duties of a juror in a capital case as defined by the court's instructions and the juror's oath. The responses of Prospective Jurors G.R. and M.W. were ambiguous or equivocal, and as to them we accept the trial court's implied determination that their death penalty views likewise would have prevented or substantially impaired their performance of the duties of a juror in a capital case.

B. *Adequacy of Trial Court's General Voir Dire*

■ Defendant contends that the trial court did not conduct an adequate general voir dire of the prospective jurors, resulting in a denial of a right under the federal Constitution's Eighth Amendment to reliable verdicts in a capital case, of a right under the federal Constitution's Sixth Amendment—and the corresponding provision of the California Constitution (Cal. Const., art. I, § 16)—to trial by an impartial jury, and of a right under the federal Constitution's Fourteenth Amendment to due process of law. We reject the contention.

Before explaining why we reject defendant's claim on the merits, we consider and reject respondent's argument that the defense did not preserve this claim for appellate review because the defense did not use all of its peremptory challenges. ■ When voir dire is inadequate, the defense is denied information upon which to intelligently exercise both its challenges for cause and its peremptory challenges. Because the exercise of peremptory

challenges cannot remedy the harm caused by inadequate voir dire, we have never required, and do not now require, that counsel use all peremptory challenges to preserve for appeal issues regarding the adequacy of voir dire.

█ *"Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." (*Rosales-Lopez v. United States* (1981) 451 U.S. 182, 188 [101 S.Ct. 1629, 1634, 68 L.Ed.2d 22].) Here, the trial court posed questions to the prospective jurors on general voir dire and then permitted counsel for both sides to pose additional questions. In this situation, reversal of the judgment is required only if the voir dire was "so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair." (*People v. Holt* (1997) 15 Cal.4th 619, 661 [63 Cal.Rptr.2d 782, 937 P.2d 213].) █ Applying this standard, we find no basis for reversal here.

We have advised trial judges to "closely follow the language and formulae for voir dire recommended by the Judicial Council in the [California Standards of Judicial Administration (Standards)] to ensure that all appropriate areas of inquiry are covered in an appropriate manner." (*People v. Holt, supra,* 15 Cal.4th at p. 661.) Here, the trial court asked most of the questions recommended in the Standards and did not prohibit the parties from asking any of the remaining questions. In addition, the questionnaires that all prospective jurors completed inquired into many of the same areas covered in the Standards' recommended voir dire questions.

Defendant complains, first, that the trial court failed to ask the 18 prospective jurors seated in the jury box whether any of them had any prior knowledge of defendant, of the alleged victim, or of the facts or events of the case. Although the court did not ask this precise question, it did inquire whether any prospective juror had previously "had any contact with or dealings with Clifford Bolden, the defendant in this case." The jury questionnaire, moreover, asked whether the prospective jurors had read newspaper accounts, seen television broadcasts, or heard radio reports about the killing of Michael Pedersen on September 9, 1986. Finally, the court asked each prospective juror whether he or she "could give both sides a fair trial in this case." Although the wording of these questions could have been improved in the manner defendant now suggests, they were adequate, particularly when the trial court permitted defense counsel to ask additional questions.

Defendant complains, next, that the trial court failed to require prospective jurors who entered the jury box after the original 18 to answer the questions

asked of the original panel members about prior acquaintance with defendant, counsel, or prospective witnesses. We find this criticism to be unfounded. At the outset of general voir dire, the trial court asked the prospective jurors not seated in the jury box "to pay attention to the questions" and to "make a little mental or written note" if any of the questions applied to them so that if they were called into the jury box they could then direct the court's attention to any question that applied to them. This was sufficient to alert the prospective jurors not originally seated in the jury box of their obligation to disclose any information about prior acquaintance with counsel, prospective witnesses, or defendant.

Defendant observes that under questioning by defense counsel, Prospective Juror A.N. said that "the judge" had told him that defendant "was caught with" some of the victim's belongings. Because the appellate record fails to indicate when, if ever, the trial court disclosed this information, defendant faults both the trial court and defense counsel for failing to ask follow-up questions to determine how Prospective Juror A.N. acquired knowledge of these facts and whether he was aware of other potentially prejudicial information about the circumstances of the crime. We decline defendant's invitation to speculate about the source of the prospective juror's information and about what additional information A.N. may have known. Defense counsel adequately questioned Prospective Juror A.N. to determine whether knowledge of defendant's possession of the victim's belongings affected A.N.'s ability to be impartial, and defense counsel could have, but chose not to, exercise a peremptory challenge against A.N. We conclude that this incident does not demonstrate that the general voir dire was so inadequate that the resulting trial was fundamentally unfair.

Finally, defendant complains that the trial court should have disclosed that the victim was White and, because defendant is Black, should have asked whether the prospective jurors held any views or biases on the subject of race that would interfere with their ability to be fair in this case. (See *Turner v. Murray* (1986) 476 U.S. 28, 36 [106 S.Ct. 1683, 1688, 90 L.Ed.2d 27].) In a case involving an interracial killing, such as this one, a trial court during general voir dire is required to question prospective jurors about racial bias *on request*. (*Id.* at pp. 36-37 [106 S.Ct. at p. 1689] ["a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry"].) Here, there was no such request, and the trial court need not make the inquiry on its own initiative. (See *People v. Kelly* (1992) 1 Cal.4th 495, 518 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

## C. *Limitation on Peremptory Challenges*

The trial court decided to have six alternate jurors in addition to the 12 regular jurors sworn to try the case. The court gave each side six

peremptory challenges to exercise against the six alternate jurors. The court required that the alternate jurors be selected individually, rather than collectively, however, and that each party exercise only one peremptory challenge as to each alternate juror position. Defendant contends that in so limiting the exercise of peremptory challenges to alternate jurors, the trial court erred under state law, and that this state law error in turn resulted in a deprivation of his rights under the federal Constitution to an unbiased jury and to due process of law (U.S. Const., 6th & 14th Amends.).

As here relevant, section 1089 provides: "[T]he prosecution and the defendant shall each be entitled to as many peremptory challenges to such alternate jurors as there are alternate jurors called." Defendant reads this provision as requiring that peremptory challenges be exercised against alternate jurors unencumbered by any restriction to a particular seat or position. Whatever the merits of this construction may be, defendant's objection "comes too late" because "[o]bjections to the jury selection process must be made when the selection occurs." (*People v. Johnson* (1993) 6 Cal.4th 1, 23 [23 Cal.Rptr.2d 593, 859 P.2d 673].) Because defendant did not object to the "per seat" limitation before jury impanelment was completed, the issue is not preserved for appellate review.

### III. ISSUES RELATING TO GUILT

### A. *Admissibility of Evidence of Prior Robberies*

■ After the case was called for trial, but before jury selection began, the prosecutor brought a motion to admit evidence of two prior criminal incidents to prove that defendant formed the intent to steal before or during the fatal assault on victim Henry Michael Pedersen. The prosecutor alleged that in the first incident, which occurred on a street in San Jose on May 4, 1979, defendant fatally stabbed Cruz Ramirez in the back and then took money from Ramirez's pocket. The prosecutor alleged that in the second incident, which occurred on September 8, 1979, defendant and his girlfriend Frances Ned hitched a ride from Gausena Wijipayala. When Wijipayala stopped the car to allow Ned to go to the bathroom, defendant seized the ignition key and demanded money. After Wijipayala refused, defendant struck him in the head and took $9 and a wristwatch.

The defense responded with a motion to exclude evidence of the same two incidents. The defense argued that these incidents were not sufficiently similar to the charged crimes to have any relevance on the issues of motive and intent, and that any probative value these incidents possessed was substantially outweighed by their prejudicial effect.

The court heard argument from both sides on their cross-motions. The prosecutor said he proposed to use evidence of the other criminal incidents only to rebut any defense claim that defendant did not form the intent to steal Pedersen's property until after the fatal assault. The prosecutor also said he was not offering the evidence to prove that defendant and not someone else had killed Pedersen. The prosecutor asserted that if defendant denied that he had killed Pedersen "there isn't any disputed issue as to when this intent was formed." The prosecutor suggested that because it was not yet clear whether the time of the formation of the intent to steal would be a disputed issue, it would be "premature for the court to rule on this motion at the present time." The prosecutor represented that he would not offer evidence of the prior incidents during the prosecution's case-in-chief unless the defense raised the issue of after-formed intent by cross-examination of prosecution witnesses or otherwise.

In reply to the court's questions, defense counsel declined to disclose the nature of the defense and declined to concede the issues of identity, motive, intent, or when the intent was formed. In response, the prosecutor repeated that he would offer evidence of the prior incidents only if the defense raised the issue of after-formed intent, and the prosecutor argued that the court should not give the defense an "early ruling" on the admissibility of the prior incidents without some assurance that the defense intended to raise that issue.

The court then announced what it described as a "tentative ruling" in these words: "There is to be no reference whatsoever to either or both of these prior acts unless and until the district attorney has brought to the court's attention his viewpoint that the proverbial door has been opened. In other words, at this juncture, I do not see that these are even being offered by the People let alone necessary to be ruled upon by the court."

The prosecutor did not seek to introduce evidence of the two prior incidents during presentation of his case-in-chief, and the matter was next raised after the prosecution had rested its case. Then, defense counsel asked the court for a "provisional ruling" on the admissibility of the two prior incidents based on "exact offers of proof" as to the proposed testimony of four defense witnesses. Defense counsel added that these witnesses were present and had been ordered back, and that "[t]he nature of their testimony is quite brief." The prosecutor stated that a ruling would be premature "until the court has actually heard the testimony." Defense counsel responded that any ruling would be provisional in the sense that it would be subject to change if the testimony did not conform to the offer of proof. Defense counsel indicated that one proposed witness was "a forensic man" who

would testify to an issue raised by the testimony of Inspector Kenneth Moses concerning prints being wiped off. Another proposed witness would testify as an expert "that it is not unusual for someone who is in a trade of whether it be prostitution or an escort, what have you, to receive property in lieu, for barter—barter for services as opposed to currency, or on some occasion collateral, for money to be collected later."

The court then stated as a "suggestion" that presentation of evidence about why a person in defendant's "particular profession" might have another person's property would put the defense "in jeopardy of having the court rule that intent is in issue" and that the admissibility of the prior crimes evidence "may well come into play and may well face the jury." The prosecutor again asserted that it would be "highly irregular for the court to rule in advance on evidence that you really haven't heard." The court responded: "Counsel, I have no intention of ruling in advance, and I could not in good conscience." The court added: "Again, I haven't heard the testimony. So many words could come into play that would completely change the court's ruling is what I'm concerned about. . . . I've given you as close as I can to the concern of the court and to the fact that the 1101(B) [referring to Evidence Code section 1101, subdivision (b)], if the witness goes into those details which raise intent, that the court could well rule favorably for the People." Defense counsel replied, "Thanks, judge."

The defense then called three witnesses: Duayne J. Dillon, James Lord, and Mary Elizabeth Reynolds. The prosecutor offered no evidence in rebuttal.

Defendant contends that the trial court erred in not ruling on the admissibility of the two prior incidents before presentation of the prosecution's case and again before presentation of the defense case, and also in "suggesting" that evidence of the prior incidents "could well" be admissible if the defense offered evidence that persons engaged in prostitution or acting as escorts commonly accept property in lieu of cash in payment for their services. Defendant contends that in so acting the trial court denied him the due process of law guaranteed by the Fourteenth Amendment to the United States Constitution.

We have previously rejected similar contentions with this explanation: "No ruling was made below. Accordingly, no review can be conducted here. '[T]he absence of an adverse ruling precludes any appellate challenge.' [Citation.] In other words, when, as here, the defendant does not secure a ruling, he does not preserve the point. That is the rule. No exception is available. [¶] Defendant may be understood to maintain that the court did not

properly decline to rule. Plainly, the appropriate standard of review is abuse of discretion. [Citation.] The question is close. The court was obviously reluctant to make a decision of this kind in anticipation of facts that might subsequently come to light. Generally, such reluctance cannot be faulted. [Citation.] Here, however, defendant expressed a not illegitimate need for a determination. The better course for the court might have been to make a ruling without prejudice. All the same, the course it actually took cannot be deemed unreasonable—especially in light of the fact that counsel did not take [the witness] on voir dire to determine whether she would in fact testify as he had represented." (*People v. Rowland* (1992) 4 Cal.4th 238, 259-260 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

Here, too, the court made no ruling on the admissibility of the prior incidents, and thus the only point preserved for appellate review is whether the trial court abused its discretion in declining to make the ruling based on an offer of proof as to the likely testimony of a defense witness. Here, too, the question is close, at least as regards the failure to rule after the prosecution had presented its case-in-chief. When the issue first arose, before jury selection had even begun, the defense expressed no legitimate need for an advance determination, but once the prosecution had rested, defense counsel explained that the defense needed a ruling to decide which defense witnesses to call. Although this constituted an expression of a legitimate need for an advance ruling, and thus the issue is close, we are not persuaded that the trial court abused its discretion by not ruling at that time, especially given the failure of the defense to suggest that the proposed witness's testimony be taken on voir dire out of the jury's presence. Moreover, even if we assume for argument's sake that the trial court erred, the error was not prejudicial.

Defendant claims that prejudice must be presumed because the record does not show what additional evidence the defense would have offered if the trial court had ruled in defendant's favor. We disagree. Defendant's trial counsel stated that the defense was planning to call four witnesses, all of whom had appeared and been ordered to return. After the trial court declined to rule, the defense called three of these four witnesses, none of whom testified in conformity with the offer of proof that prostitutes and escorts may take property instead of cash as payment for their services. Thus, the record fairly establishes that because of the trial court's ruling, or lack of ruling, the defense failed to call only one witness, who would likely have testified in conformity with the offer of proof.

The defense was not prejudiced by the absence of this witness's testimony. In this regard, we note that in closing arguments to the jury, defense counsel argued that it was reasonable to infer that defendant had obtained

Michael Pedersen's property in payment for, or as collateral to secure payment for, defendant's services as an escort. In reply to this argument, the prosecutor briefly questioned whether it was reasonable to infer that defendant "would even accept something like that with the business he was in," but then the prosecutor proceeded to make a much stronger argument. The prosecutor said it was highly unlikely that in payment for escort services Pedersen would give "a cherished bracelet with his initials on it that he's had for years, . . . a camera that belongs to his brother . . . [and] a set of opera glasses that he has used for years and years, performance after performance, something that obviously he cherishes . . . ." Applying the general test for harmless error under state law (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]), we conclude that it is not reasonably probable that admission of the proposed defense testimony—that it is not unusual for a prostitute or escort to accept payment in the form of property rather than in cash—would have resulted in guilt verdicts more favorable to defendant. Because the error, if error there was, did not significantly affect defendant's ability to present a defense, it did not violate any of defendant's rights under the federal Constitution.

### B. *Evidence of Knife-scraping Tests*

During the guilt phase, prosecution witness Debbie Madden, a criminalist employed by the San Francisco Police Department Crime Laboratory, testified that she scraped a dried stain from a knife that defendant was carrying when he was arrested. She determined that the stain was human blood and, using electrophoretic multisystem testing, found that it contained genetic markers consistent with the blood of victim Pedersen and inconsistent with defendant's blood.

Defendant contends that the trial court erred in denying a timely defense motion to exclude this evidence, that its exclusion was required both by state evidence law and by the due process clause of the Fourteenth Amendment to the United States Constitution, and that failure to exclude the evidence renders the resulting death judgment so unreliable as to constitute cruel and unusual punishment in violation of the Eighth Amendment to the federal Constitution. We reject this contention and each of its parts.

In *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*), this court held that evidence obtained through a new scientific technique may be admitted only after its reliability has been established under a three-pronged test. The first prong requires proof that the technique is generally accepted as reliable in the relevant scientific community. (*Id.* at p. 30.) The second prong requires proof that the witness testifying about the

technique and its application is a properly qualified expert on the subject. (*Ibid.*) The third prong requires proof that the person performing the test in the particular case used correct scientific procedures. (*Ibid.*) This court further held that proof of a technique's general acceptance in the relevant scientific community would no longer be necessary once a published appellate decision had affirmed a trial court ruling admitting evidence obtained by that scientific technique, "at least until new evidence is presented reflecting a change in the attitude of the scientific community." (*Id.* at p. 32.)

Until 1993, this rule was generally known in this state as the *Kelly-Frye* rule because this court in *Kelly* had relied on the reasoning of a federal appellate court decision, *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013 (*Frye*). In 1993, the United States Supreme Court held that the Federal Rules of Evidence had superseded *Frye* (*Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 587 [113 S.Ct. 2786, 2793-2794, 125 L.Ed.2d 469]), and our state law rule is now referred to simply as the *Kelly* test or rule. (*People v. Soto* (1999) 21 Cal.4th 512, 515, fn. 3 [88 Cal.Rptr.2d 34, 981 P.2d 958].)

During jury selection, the defense brought a motion objecting "to the introduction of serological test results obtained by use of the Multisystem on *Kelly-Frye* grounds." In the moving papers, the defense acknowledged that a published appellate decision—*People v. Morris* (1988) 199 Cal.App.3d 377 [245 Cal.Rptr. 52] (*Morris*)—had affirmed a trial court ruling that electrophoretic multisystem testing of bloodstains is generally accepted in the relevant scientific community. The defense argued, however, that *Morris* was "not controlling," that it was "fundamentally flawed," that it did not decide whether multisystem results for the genetic markers esterase D (EsD) and phosphoglucomutase (PGM) were generally accepted as reliable, and that new evidence reflected a change in the attitude of the scientific community. In support of these arguments, the defense submitted more than 1800 pages of exhibits.

The prosecution submitted a written response objecting to a "full-blown *Kelly-Frye* hearing" and arguing that the trial court should not receive evidence on whether the technique of electrophoretic multisystem testing had been generally accepted in the scientific community. The defense submitted a reply to the prosecution's response.

After reading the papers submitted by the parties and hearing argument from counsel, the trial court scheduled an evidentiary hearing on the defense motion but limited the scope of that hearing to the third *Kelly* prong, which was, in the court's words, "whether the prosecution can establish in this case

that these particular bloodstains were validly and reliably preserved and analyzed."

The *Kelly* evidentiary hearing began on October 22, 1990, and ended on December 5, 1990. Seven witnesses testified over the course of 16 court days. After hearing additional argument from counsel, the trial court denied the defense motion and ruled that evidence of the blood test results was admissible.

Defendant argues, first, that evidence received at the hearing established that electrophoretic multisystem testing of blood is not a reliable or valid methodology for identifying the genetic markers EsD and PGM. Regarding EsD, defendant argues that the evidence showed that a multisystem reading of EsD type 2-1 (the type found on the bloodstain taken from the knife) produces a "false match," or a "false positive," 16 percent of the time, and for this reason electrophoretic multisystem testing of blood does not produce reliable or valid results for EsD type 2-1. We find the argument unpersuasive.

Under the *Kelly* test, the admissibility of evidence obtained by use of a scientific technique does not depend upon proof to the satisfaction of a court that the technique is scientifically reliable or valid. (*People v. Soto, supra,* 21 Cal.4th at p. 519.) Because courts are ill suited to make such determinations, admissibility depends upon whether the technique is generally accepted as reliable in the relevant scientific community. Because there was a published appellate decision holding that electrophoretic multisystem testing of blood was generally accepted as reliable in the relevant scientific community (*Morris, supra,* 199 Cal.App.3d 377; see also *People v. Hart* (1999) 20 Cal.4th 546, 635 [85 Cal.Rptr.2d 132, 976 P.2d 683]; *People v. Wash* (1993) 6 Cal.4th 215, 242 [24 Cal.Rptr.2d 421, 861 P.2d 1107]; *People v. Fierro* (1991) 1 Cal.4th 173, 214 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *People v. Smith* (1989) 215 Cal.App.3d 19, 26 [263 Cal.Rptr. 678]), defendant could challenge the scientific validity of the technique only by presenting "new evidence . . . reflecting a change in the attitude of the scientific community." (*Kelly, supra,* 17 Cal.3d at p. 32.) Defendant did not present such evidence. Therefore, the only issue before the trial court at the evidentiary hearing was whether the proposed evidence satisfied the third *Kelly* prong— whether the person who performed the test used correct scientific procedures. (*Id.* at p. 30.)

Defendant argues, however, that regardless of the *Kelly* rule, the trial court should have excluded the electrophoretic multisystem test results under the general evidence rules for expert testimony or under the federal Constitution's due process clause or its prohibition against cruel and unusual punishment (U.S. Const., 8th & 14th Amends.). Because defendant did not

object on those grounds in the trial court, they are not preserved for appellate review. (Evid. Code, § 353, subd. (a).)

Moreover, even assuming that issues about the scientific validity of electrophoretic multisystem testing of blood are properly before us, we find defendant's claim—that as applied to EsD type 2-1 this testing produces a "false match," or a "false positive," 16 percent of the time—to be a substantial distortion or mischaracterization of the evidence. What the evidence showed was that electrophoretic multisystem testing does not distinguish EsD type 2-1 from EsD type 5-1, in that both of these blood types produce exactly the same band pattern on a multisystem run. The evidence showed that in the White population, 84 percent of the occurrences of this band pattern are type 2-1 and only 16 percent are type 5-1. Although electrophoretic multisystem testing cannot distinguish these EsD types from each other, it does reliably and consistently distinguish them from EsD types 1 and 2. Because EsD type 5-1 is significantly less common than type 2-1, a positive result for these two types is generally referred to as a type 2-1 result, although it might more accurately be described as a type 2-1 *or* 5-1 result. Here, Madden's electrophoretic multisystem testing of the bloodstain on the knife showed that the blood was either EsD type 2-1 or EsD type 5-1 and not any other type. This result eliminated defendant as a possible donor, because he is EsD type 1. It did not eliminate victim Pedersen because he was also EsD type 2-1 or 5-1. The inability of electrophoretic multisystem testing to distinguish EsD types 2-1 and 5-1 from each other does not affect the scientific validity of these results.

Defendant makes a similar, and similarly unpersuasive, argument regarding the genetic marker PGM. With a single multisystem run, it is possible to distinguish PGM into three types: 1, 2, and 2-1. With an additional run or by using a different technique, it is possible to further refine the PGM finding to discriminate among 10 PGM subtypes. (See *People v. Kaurish* (1990) 52 Cal.3d 648, 672, fn. 2 [276 Cal.Rptr. 788, 802 P.2d 278].) Here, Madden testified that because of the small quantity of the stain, she was only able to perform a single multisystem run, and the band pattern on that run indicated a PGM type 1, which was consistent with the blood of both defendant and victim Pedersen. The multisystem's inability to distinguish PGM subtypes on a single run does not affect the scientific validity of these results; it merely affects their weight or significance.

In summary, the inability of electrophoretic multisystem testing to distinguish EsD types 2-1 and 5-1 from each other, and its inability to distinguish PGM subtypes does not affect the scientific validity of the test results, nor does it provide any basis to question the accuracy of Madden's testimony at

trial that the blood on the knife was consistent with Pedersen's blood and with the blood of 13 percent of the White population, but was inconsistent with defendant's blood.

Next, defendant challenges the reliability of Madden's testimony that the stain on the knife was human blood. To determine whether the stain was human blood, Madden used a test called the Ouchterlony species test. Defendant claims that the trial court should have excluded this testimony under the third prong of the *Kelly* test because the defense demonstrated, during the *Kelly* hearing, that Madden did not use correct scientific procedures in performing the Ouchterlony species test. In particular, defendant faults Madden for not using a substrate control by simultaneously testing the unstained portion of the knife and also for reading the result after only four hours rather than allowing the plate on which the test was performed to develop overnight.

We question whether defendant has properly preserved a *Kelly* objection to the Ouchterlony species test. His written motion objected to "introduction of serological test results obtained by use of the Multisystem . . . ." It is not clear that the objection included also the Ouchterlony species test. In any event, assuming that the validity of the procedures used in performing the Ouchterlony species test was before the trial court under the third prong of the *Kelly* test, we find no error in the trial court's ruling. The evidence on whether Madden used correct scientific procedures was in conflict. Defense witnesses Patricia L. Zajac and Mary Elizabeth Reynolds testified that Madden should have used a negative control and should have allowed the testing plate to develop for 24 hours. On the other hand, Gary Alan Sims, whom the defense retained to observe the testing, testified that after observing the Ouchterlony species testing he formed the opinion that the stain was human blood, although his opinion would have been stronger if a negative control had been used. And Edward Thomas Blake testified that if a clear reaction appeared, an Ouchterlony species test result could be read after three or four hours, and that negative controls were not essential when testing a stain on a knife. The trial court resolved this conflict in the testimony by ruling in the prosecution's favor. We infer from the ruling a finding by the trial court that Madden used correct scientific procedures for the Ouchterlony species test. Because the court's implied finding is supported by substantial evidence, defendant's challenge does not succeed.

C. *Expert Testimony About Knife-scraping Tests*

As mentioned in discussing the previous contention, Debbie Madden, a criminalist employed by the San Francisco Police Department Crime Laboratory, scraped a dried stain from a knife that defendant was carrying when

he was arrested. Using certain forensic testing procedures, she determined that the stain was human blood and that it contained genetic markers consistent with the blood of victim Pedersen and inconsistent with defendant's blood. During jury selection, the defense brought a motion objecting to evidence of the testing and results.

At the hearing on defendant's motion, Madden testified that after scraping the dried stain material from the knife, she determined that the amount of material was insufficient to perform more than one typing test, and that she then notified the district attorney's office of this determination and suggested that defense counsel be notified so the defense could have its own expert observe her testing of the dried stain material and collaborate with her in that testing. The defense objected on the ground of attorney-client privilege to any further reference to a defense expert being present during the testing of the dried stain material. The trial court deferred its ruling on the objection.

Later, the prosecution announced its intention to call the defense expert, Gary Alan Sims, to testify at the *Kelly* hearing. Invoking the attorney-client and work product privileges, the defense objected and requested an in camera hearing out of the prosecutor's presence to discuss confidential communications. The court agreed to hold an in camera hearing on the privilege issues. During that hearing, Sims testified that while he was employed as a criminalist at a private forensic laboratory the defense had hired him as a consultant with the understanding that any reports he prepared would be communicated to the defense only and not to the prosecution. He was to monitor and observe the work of Debbie Madden in testing the dried stain material to make sure the tests were being done properly. After this in camera hearing, the trial court denied the defense motion to exclude Sims's testimony.

Sims then testified at the *Kelly* hearing about his participation in the testing of the dried stain material. When Madden explained to him the tests she proposed to run, he agreed that they were appropriate. For the multisystem run, he actually placed the samples on the gel. After Madden read the results of the tests, Sims independently read the results and, because he did not disagree with Madden's readings, he initialed her findings in the bench notes.

Neither side called Sims as a witness to testify at the trial. Sims's name was first mentioned at the trial during cross-examination of prosecution witness Debbie Madden, who testified, in response to defense counsel's questions, that Sims was someone who had participated in the testing of the

dried stain material but who was "not a member of [Madden's] crime lab." In cross-examining Madden, defense counsel used a sketch that Sims had drawn and attempted, without success, to introduce Sims's prior testimony. On redirect, Madden testified, without objection, that Sims was present during the testing at the request of defense counsel. She also testified that Sims had placed his initials on her bench notes for the testing, and that ordinarily this indicates agreement with the readings of the results.

To cast doubt on the reliability of Madden's conclusions, the defense called as an expert witness Mary Elizabeth Reynolds, who was the assistant manager of a hospital's clinical serology laboratory but who, unlike Sims, lacked experience in forensic serology. On direct examination, defense counsel asked her to consider a drawing that Sims had prepared showing certain test results. On cross-examination, she testified that Sims was a criminalist whom the defense had hired to observe Madden performing the testing on the knife stain, and that he had testified to an opinion that the knife stain was human blood.

During argument to the jury at the guilt phase, the prosecutor urged the jury, in assessing the reliability of the dried stain test results, to consider the failure of the defense to call Sims, the expert the defense had hired to collaborate in that testing.

Defendant now contends that the trial court erred in denying the defense motion to exclude all evidence of Sims's participation in the dried stain testing, and that the court's ruling violated the attorney-client privilege and his rights under the state and federal Constitutions to due process of law and to the effective assistance of counsel. We reject the claim.

Defendant relies on *People v. Meredith* (1981) 29 Cal.3d 682 [175 Cal.Rptr. 612, 631 P.2d 46]. There, a defendant charged with murder and robbery told his attorney that he had placed the victim's wallet in a trash can behind his own residence. The attorney sent an investigator to retrieve the wallet and, after examining it, turned it over to the police. At trial, the prosecution called the defense investigator as a witness to testify about the location where he found the wallet, but the prosecution did not attempt to introduce evidence about how the investigator came to look there. On the appeal from his resulting conviction, the defendant argued that admission of evidence about the location where the investigator found the wallet violated the attorney-client privilege. This court held that "an observation by defense counsel or his investigator, which is the product of a privileged communication, may not be admitted unless the defense by altering or removing physical evidence has precluded the prosecution from making that same

observation." (*Id.* at p. 686.) Because the investigator's removal of the wallet "frustrated any possibility that the police might later discover it in the trash can," the evidence was properly admitted. (*Id.* at p. 687.)

Defendant argues that under the rule declared in *People v. Meredith, supra,* 29 Cal.3d 682, the trial court should not have admitted evidence of Sims's collaboration in the testing of the dried stain. We disagree. Nothing in the record shows that any of Sims's observations during the testing were the product of a privileged communication. Defendant points to an offer of proof by defense counsel during the hearing in chambers to the effect that defendant had told counsel that the stain on the knife was not Pedersen's blood but that it could be either human blood (because various persons had used the knife for martial arts exercises, during which they might have cut themselves), or animal blood (because defendant had used the knife to cut meat for cooking). Although this was evidence of a privileged communication between defendant and counsel, there was no evidence that counsel disclosed any of this communication to Sims or that Sims in any way relied upon the communication, or upon any information derived from the communication, when he collaborated with Madden in the testing of the dried stain material. Neither the knife itself nor the bloodstain on the knife was discovered as a result of any privileged communication. Because there is no evidence that Sims's observations during the testing or his opinions concerning the validity of the testing were the product of a privileged communication, admission of Sims's testimony and other evidence concerning his role in the testing of the dried stain material did not violate defendant's attorney-client privilege.

Defendant's reliance on *Prince v. Superior Court* (1992) 8 Cal.App.4th 1176 [10 Cal.Rptr.2d 855] is equally misplaced. There, police investigators at a murder scene collected a semen stain from a comforter and two vaginal swabs from the victim's corpse. A prosecution criminalist divided the stain from the comforter into three parts. He sent one part to the Federal Bureau of Investigation, which reported the sample insufficient for matching purposes. He sent the second part to a private laboratory (Cellmark), which performed DNA analysis using the RFLP method and reported that the sample matched the DNA profile of the defendant. The trial court ordered that the third part of the semen stain from the comforter be tested by the RFLP method, that the defendant could select the testing facility subject to the prosecution's consent, and that all reports of these test results would be available to both the defense and the prosecution. The trial court ordered that the prosecution and the defense each be given one of the vaginal swabs for DNA testing using the PCR method and that each party would be permitted to observe both tests and receive reports of both tests. (*Id.* at pp. 1178-1179.)

The defendant petitioned the Court of Appeal for a writ of mandate. He did not challenge the ruling concerning the stain on the comforter, but he did

challenge the ruling on the vaginal swabs insofar as it permitted the prosecution to observe the testing of the swab assigned to the defense and to obtain the results of that testing. The Court of Appeal agreed that this portion of the trial court's order deprived the defendant of the effective assistance of counsel. The Court of Appeal explained: "While it is true the goal of the judicial process is to find the truth, allowing the defense to conduct an independent test of the DNA will not unfairly prejudice the People or result in injustice. If the test matches [the defendant] with the crime, defense counsel will not call the expert and the case will proceed on evidence already possessed by the People as if the defense test had not been made. The People will have, at least, four semen test samples. If the defense test excludes [the defendant], the tester will surely testify and the defense will have to disclose his or her identity and provide any report to the prosecution." (*Prince v. Superior Court, supra,* 8 Cal.App.4th at p. 1180.)

Here, there was not a sufficient quantity of material for independent testing by the defense and the prosecution. There was a single series of tests on the limited sample witnessed by two individuals, Madden and Sims. (See *People v. Cooper* (1991) 53 Cal.3d 771, 814-816 [281 Cal.Rptr. 90, 809 P.2d 865].) When the defense questioned the validity of the test results, based on alleged inadequacy in Madden's documentation of the test procedures and the results obtained, the prosecution had a substantial need for Sims's testimony as the only other percipient witness to the tests. The prosecutor did not question Sims about any reports he may have submitted to defense counsel and focused mainly upon what Sims had seen rather than upon the opinions he may have formed. Although the prosecution did question Sims at the *Kelly* hearing about his initials on the lab notes, the act of initialing the lab notes was not confidential and thus not within the attorney-client or work product privileges. The trial court's ruling permitting the prosecution to call Sims as a witness at the *Kelly* hearing did not violate defendant's right to the effective assistance of counsel.

Finally, defendant argues that the jury should not have been told that the defense had retained Sims as an expert because this information lacked relevance. On the contrary, information that a party retained an expert is relevant to the possible bias of that expert. (*People v. Coddington* (2000) 23 Cal.4th 529, 617 [97 Cal.Rptr.2d 528, 2 P.3d 1081], overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].) Although Sims did not testify before the jury, and thus his credibility was never directly placed in issue, defense cross-examination elicited testimony from Madden that Sims was present during the testing of the dried stain material. In deciding the significance of the failure of either party to call Sims as a witness, the jury could properly

consider the information that the defense had hired Sims to observe the testing. (See *People v. Wash, supra,* 6 Cal.4th at pp. 262-263 [prosecutor may comment on defense's failure to call logical witness].)

### D. *Sufficiency of the Evidence of Robbery*

■ Defendant contends the evidence at trial was insufficient to support the verdict finding him guilty of robbery. In particular, he argues that there was insufficient evidence that property was taken from victim Pedersen's immediate presence by force or fear, and he asserts that a conviction based on insufficient evidence violates his right to due process under both the federal and state Constitutions (U.S. Const., 14th Amend.; Cal. Const., art. I, § 15).

■ "To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128 [113 Cal.Rptr.2d 27, 33 P.3d 450].)

■ From evidence that a defendant killed another person and at the time of the killing took substantial property from that person, a jury ordinarily may reasonably infer that the defendant killed the victim to accomplish the taking and thus committed the offense of robbery. (*People v. Hughes* (2002) 27 Cal.4th 287, 357 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Kipp, supra,* 26 Cal.4th at p. 1128; *People v. Turner* (1990) 50 Cal.3d 668, 688 [268 Cal.Rptr. 706, 789 P.2d 887].)

Here, the prosecution presented evidence that defendant killed Pedersen and at the time of the killing took Pedersen's binoculars, wallet, bracelet, cuff links, camera, coins, and wristwatch. This evidence supports an inference that defendant robbed Pedersen, and it constitutes substantial evidence supporting the robbery verdict. Contrary to defendant's arguments, the failure of the evidence to conclusively rule out various scenarios under which defendant might not be guilty of robbery does not render the evidence insufficient to support the robbery verdict. (See *People v. Hill* (1998) 17 Cal.4th 800, 849 [72 Cal.Rptr.2d 656, 952 P.2d 673] [court's opinion that evidence could be reconciled with a finding of innocence, or of guilt of a lesser crime, does not warrant reversal of judgment].)

### E. *Sufficiency of the Evidence of a Killing During Robbery*

■ Defendant contends that even if, as we have concluded, the trial evidence is sufficient to support the verdict finding him guilty of robbery, it

is not sufficient to support the special circumstance finding that the murder occurred in the commission of the robbery. More particularly, he argues that the guilt phase evidence is insufficient to establish that the robbery was not merely incidental to the killing in the sense that defendant's "primary criminal goal" was to kill rather than to steal.

To prove a felony-murder special circumstance like murder in the commission of a robbery, "the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder." (*People v. Mendoza* (2000) 24 Cal.4th 130, 182 [99 Cal.Rptr.2d 485, 6 P.3d 150].) "Concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance." (*People v. Raley* (1992) 2 Cal.4th 870, 903 [8 Cal.Rptr.2d 678, 830 P.2d 712].) It is only when the underlying felony is merely incidental to the murder that the felony-murder special circumstance does not apply. (*Ibid.*)

We find here no evidence suggesting, or requiring the jury to conclude, that defendant took Pedersen's property merely to obtain a reminder or token of the incident (see *People v. Marshall* (1997) 15 Cal.4th 1, 41 [61 Cal.Rptr.2d 84, 931 P.2d 262]), to give a false impression about his actual motive for the murder, or in some other way to facilitate or conceal the killing (see *People v. Zapien* (1993) 4 Cal.4th 929, 984 [17 Cal.Rptr.2d 122, 846 P.2d 704]). Nor was there substantial evidence of any motive for the murder apart from accomplishing the robbery. Rather, the jury could reasonably infer from the evidence that defendant killed Pedersen primarily and perhaps solely to facilitate the robbery, by preventing him from resisting or from alarming neighbors or others. (See *People v. Turner, supra,* 50 Cal.3d at p. 688.) Accordingly, we conclude that the evidence is sufficient to support the robbery-murder special circumstance.

### F. *Denial of Mistrial Motion*

James Ludlow, a police officer, testified about the circumstances of defendant's arrest. During his testimony, the prosecutor asked: "Did you determine the present address at that time in September of 1986 of Mr. Clifford Bolden?" Ludlow answered: "Yes, I did." The prosecutor asked: "And where was that?" Ludlow answered: "It was at the Department of Corrections parole office located at—." The prosecutor interrupted, asking: "What I'm talking about is where was the address?" Ludlow then answered with the address where defendant was then living.

Later that day, out of the jury's presence, the defense moved for a mistrial, arguing that Ludlow's reference to a parole office was very prejudicial to

defendant because it implied that defendant had at least one prior felony conviction for which he had served a term in state prison. The defense had known that Ludlow had testified at the preliminary hearing that he had obtained defendant's address from his parole records and had received an assurance from the prosecutor that he had warned Ludlow not to refer to the parole office. The prosecutor assured the court that he had so warned Ludlow on three occasions, the last being on the morning of Ludlow's testimony, and that he was "taken by surprise" when Ludlow mentioned the parole office in his testimony, but he did not think there was sufficient prejudice to warrant a mistrial. The trial court took the motion under submission and later denied it, noting that the very brief reference was unlikely to make a lasting impression on the jury.

 Defendant now contends that the trial court erred in denying the mistrial motion, and that the ruling denied him his right under the federal Constitution to due process of law (U.S. Const., 14th Amend.). We find no error, and no denial of due process, in the trial court's ruling.

A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial. (*People v. Ayala* (2000) 23 Cal.4th 225, 282 [96 Cal.Rptr.2d 682, 1 P.3d 3].) Here, although the witness referred briefly to a parole office in connection with obtaining defendant's address, the witness's answer was nonresponsive and the prosecutor interrupted before the answer was completed. It is doubtful that any reasonable juror would infer from the fleeting reference to a parole office that defendant had served a prison term for a prior felony conviction. The incident was not significant in the context of the entire guilt trial, and the trial court did not abuse its discretion in ruling that defendant's chances of receiving a fair trial had not been irreparably damaged.

### G. Jury Instructions Defining Robbery

 Defendant contends that the trial court's instructions to the jury on the offense of robbery were inadequate in two respects: (1) they failed to state that defendant's application of force must have been motivated by an intent to steal, and (2) they failed to state that the victim must have been either aware of the taking or prevented from becoming aware by the application of force.

#### 1. Theft as motive for application of force

The trial court refused a defense request for this special jury instruction: "An act of force accompanied by a theft does not constitute robbery unless

the act of force was motivated by an intent to steal. If the intent to steal does not arise until force has been used against the victim, no robbery has taken place. If an individual kills for reasons unrelated to theft, for example, because of anger or revenge, and then decides to take advantage of the situation by stealing some object from the person of the decedent, the taking will constitute at most a theft and not a robbery."

The standard jury instructions on felony murder (CALJIC No. 8.21) and robbery (CALJIC No. 9.40), which the trial court here used to instruct the jury, adequately explain that for the crime of robbery the defendant must form the intent to steal before or during rather than after the application of force to the victim, and that the defendant must apply the force for the purpose of accomplishing the taking. (*People v. Hughes, supra,* 27 Cal.4th at pp. 358-360; *People v. Silva* (2001) 25 Cal.4th 345, 371 [106 Cal.Rptr.2d 93, 21 P.3d 769].) More specific instructions on this issue, like the one that defendant proposed here, are considered pinpoint instructions that the trial court is required to give, if at all, only upon request. (*People v. Hughes, supra,* at p. 361.)

Here, the special instruction that defendant proposed was misleading. In stating that a defendant has not committed robbery if "the intent to steal does not arise until force has been used against the victim," the instruction appears improperly to preclude a robbery conviction when the defendant has formed the intent to steal after beginning to apply force but before the application of force is concluded. Because the proposed instruction was misleading in suggesting that formation of intent to steal *during* the application of force was insufficient, and because the point was adequately covered by the instructions that the court did give, the trial court acted correctly in refusing to use this proposed instruction.

### 2. *Victim's awareness of application of force*

Defendant also contends that the trial court's instructions to the jury on the offense of robbery were inadequate because they failed to state that the victim must either have been aware of the taking or have been prevented from becoming aware by the defendant's application of force. Defendant argues, in other words, that if the victim was asleep or inebriated to the point of unconsciousness, then a person taking property from the victim's person or immediate presence would have no need to use force to prevent the victim from resisting or calling for help. An application of force in this situation, defendant argues, would not make the crime robbery, regardless of the intent of the person applying the force, because the force would not be the means by which the taking was accomplished.

The Penal Code's definition of robbery, as here relevant, states that robbery is a "felonious taking . . . accomplished by means of force or fear." (§ 211.) Consistent with this definition, the trial court instructed the jury that the elements of robbery include a taking of property "against the will of" the victim "accomplished either by force, violence, fear or intimidation." This instruction correctly explained the requirement that force or fear be used to accomplish the taking. If defendant thought the point needed additional clarification or explanation, defendant should have "requested appropriate clarifying or amplifying language" (*People v. Andrews* (1989) 49 Cal.3d 200, 218 [260 Cal.Rptr. 583, 776 P.2d 285]); absent such a request, the point is not preserved for appellate review.

### H. *Jury Instructions on Special Circumstance*

The court instructed the jury on the elements of the robbery-murder special circumstance in the language of the standard jury instruction, CALJIC No. 8.81.17. Among other things, the instruction explained the requirement that the murder have been "committed in order to carry out or advance the commission of the crime of robbery; or to facilitate the escape therefrom or to avoid detection," and the instruction expressly admonished that "the special circumstance referred to in these instructions is not established if the robbery was merely incidental to the commission of the murder."

Defendant requested, but the trial court refused to give, the following special instruction: "In order to find the special circumstance in count I to be true, you must be convinced beyond a reasonable doubt that the primary motivation for the killing was robbery, or that the killing was done to avoid detection of the robbery." In requesting the special instruction, defense counsel explained that the standard instruction did not use the word "primary" to describe the required motivation for the killing. In refusing the instruction, the trial court noted that counsel would "have their opportunity to highlight," apparently meaning that the phrasing of the proposed instruction was argumentative.

We do not agree with defendant that the trial court erred in declining to give the proposed special instruction. The standard instruction that the court gave correctly and adequately explained the requirement for the special circumstance that the murder be committed in furtherance of the robbery or, otherwise stated, that the robbery not be merely incidental to the murder. Defendant's trial counsel apparently modeled the proposed special instruction on language in one of this court's decisions: "A special circumstance allegation of murder committed during a robbery has not been established where the accused's *primary criminal goal* 'is not to steal but to kill and the

robbery is merely incidental to the murder . . . because its sole object is to facilitate or conceal the primary crime.' " (*People v. Thompson* (1980) 27 Cal.3d 303, 322 [165 Cal.Rptr. 289, 611 P.2d 883], italics added.) More recently, however, we have not phrased the requirement in terms of the defendant's "primary" motivation but instead have stated that "[c]oncurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance." (*People v. Raley, supra*, 2 Cal.4th at p. 903.)

Thus, contrary to defendant's argument here, a jury deciding the truth of the special circumstance allegation is not required to assign a hierarchy to the defendant's motives in order to determine which of multiple concurrent intents was "primary," but instead the jury need only determine whether commission of the underlying felony was or was not merely incidental to the murder. The proposed special instruction would have added nothing to the jury's understanding of this requirement.

## I. Pinpoint Instruction on Consent to Taking

Defendant requested, but the trial court refused to give, the following special instruction: "If you are not convinced beyond a reasonable doubt that defendant obtained the property in question without consent, then you must give the defendant the benefit of that doubt." In requesting the special instruction, defense counsel explained that the purpose was to focus the jury's attention on one element of robbery and to relate that element to the reasonable doubt standard of proof. In refusing the instruction, the trial court noted that jury instructions should not "highlight one side or the other," and that the point was covered by other instructions. ■ Defendant contends that the trial court erred in so ruling, and that the error deprived him of a right under the federal Constitution to be acquitted absent proof of guilt beyond a reasonable doubt.

■ We have suggested that "in appropriate circumstances" a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged. (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 885 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845]; accord, *People v. Lucero* (1988) 44 Cal.3d 1006, 1021 [245 Cal.Rptr. 185, 750 P.2d 1342].) But a trial court need not give a pinpoint instruction if it is argumentative (*People v. Mincey, supra*, 2 Cal.4th at p. 437), merely duplicates other instructions (*People v. Catlin* (2001) 26 Cal.4th 81, 152 [109 Cal.Rptr.2d 31, 26 P.3d 357]), or is not supported by substantial evidence (*People v. Marshall, supra*, 15 Cal.4th at pp. 39-40). An instruction that does no more than affirm that the prosecution must prove a

particular element of a charged offense beyond a reasonable doubt merely duplicates the standard instructions defining the charged offense and explaining the prosecution's burden to prove guilt beyond a reasonable doubt. ■ Accordingly, a trial court is required to give a requested instruction relating the reasonable doubt standard of proof to a particular element of the crime charged only when the point of the instruction would not be readily apparent to the jury from the remaining instructions.

Here, the jury received accurate and complete instructions on the prosecution's burden of proof and on the elements of robbery, including the requirement that the taking of property be without the alleged victim's consent. Thus, the point of the requested instruction was readily apparent from the instructions given, and nothing in the particular circumstances of this case suggested a need for additional clarification. The trial court did not err in refusing to give this requested pinpoint instruction.

J. *Failure to Instruct on Voluntary Intoxication*

■ Defendant contends that the trial court, on its own initiative, should have instructed the jury that if it found that defendant was voluntarily intoxicated at the time of the charged crimes it could consider that fact in deciding whether defendant formed the required mental states. Defendant further contends that the trial court's error in failing to give a voluntary intoxication instruction denied him his rights under the federal Constitution to jury trial, to a reliable determination of guilt in a capital case, and to due process of law (U.S. Const., 6th, 8th, & 14th Amends.).

We reject these contentions. As we explained in *People v. Saille* (1991) 54 Cal.3d 1103, 1120 [2 Cal.Rptr.2d 364, 820 P.2d 588], an instruction on voluntary intoxication, explaining how evidence of a defendant's voluntary intoxication affects the determination whether defendant had the mental states required for the offenses charged, is a form of pinpoint instruction that the trial court is not required to give in the absence of a request. (See also *People v. Lewis* (2001) 25 Cal.4th 610, 650 [106 Cal.Rptr.2d 629, 22 P.3d 392].) This rule applies to cases, like this one, that were tried before our decision in *Saille. (People v. Hughes, supra,* 27 Cal.4th at p. 342.) Here, because there was no such request, the trial court did not err in failing to instruct on voluntary intoxication.

K. *Failure to Instruct on Intent to Kill as Element of Felony-murder Special Circumstance*

■ Defendant contends that the judgment must be reversed as to penalty, and the special circumstance finding must be set aside, because the

trial court failed to instruct the jury that intent to kill is a required element of the felony-murder special circumstance. We disagree.

In 1983, this court decided *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], in which we construed the statutory provision defining the felony-murder special circumstance (§ 190.2, subd. (a)(17)) as requiring an intent to kill, whether the defendant was the actual killer or an accomplice. In 1987, we overruled *Carlos* in *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], holding that intent to kill was not a requirement for an actual killer. For crimes committed during the so-called window period between those two decisions, however, intent to kill continues to be a requirement for the felony-murder special circumstance. (*People v. Marshall, supra,* 15 Cal.4th at pp. 41-42.)

Because the killing of Henry Michael Pedersen occurred in September 1986, during this window period, the trial court was required to instruct the jury that intent to kill was an element of the robbery-murder special circumstance. The trial court did not so instruct, and, indeed, it expressly told the jury that intent to kill was *not* required. This was error.

Because defendants in capital cases have a right under the federal Constitution to a jury determination of "any fact on which the legislature conditions an increase in their maximum punishment" (*Ring v. Arizona* (2002) 536 U.S. 584, 589 [122 S.Ct. 2428, 2432, 153 L.Ed.2d 556]), we apply the harmless error test for federal constitutional error set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]. (*People v. Williams, supra,* 16 Cal.4th at p. 689; *People v. Johnson, supra,* 6 Cal.4th at p. 45.) Under that test, an appellate court may find an error harmless only if, after conducting a thorough review of the record, the court determines beyond a reasonable doubt that the jury verdict would have been the same absent the error. (*Neder v. United States* (1999) 527 U.S. 1, 7-10 [119 S.Ct. 1827, 1832-1834, 144 L.Ed.2d 35].)

We have found error in failing to instruct that the felony-murder special circumstance requires intent to kill to be harmless when, because of the circumstances and manner in which the defendant killed the victim, the evidence of intent to kill was overwhelming and the jury returning the special circumstance finding could have had no reasonable doubt that the defendant had the intent to kill. (*People v. Osband* (1996) 13 Cal.4th 622, 681 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People v. Cudjo* (1993) 6 Cal.4th 585, 630 [25 Cal.Rptr.2d 390, 863 P.2d 635]; see also *People v. Johnson, supra,* 6 Cal.4th at pp. 45-47 [applying same analysis for multiple-murder special circumstance].)

Here, the victim died from a single stab wound to the back that penetrated the victim's lungs and spleen. The stab wound was five inches long and five to six inches deep. At the scene of the killing there were no signs of a struggle or evidence of a quarrel. In plunging the knife so deeply into such a vital area of the body of an apparently unsuspecting and defenseless victim, defendant could have had no other intent than to kill. Defendant presented no evidence that the killing was other than intentional. Under these circumstances, after thorough review of the appellate record, we are satisfied beyond a reasonable doubt that the jury's true finding on the special circumstance allegation would have been the same absent the trial court's instructional error.

## L. Suspension of Jury Deliberations

During the jury selection process, the trial court informed the jurors that the court would not be in session on Fridays or during the week between Christmas and New Year's Day. The jury began its guilt phase deliberations on Thursday, December 20, 1990. At 4:30 p.m., the prosecutor suggested that the court ask the jurors if they would be willing to continue deliberations on the next day even though it was a Friday. Defense counsel objected, however, and the trial court rejected the prosecutor's suggestion.

The trial proceedings were in recess until Wednesday, January 2, 1991, when the jury resumed its deliberations. The jury deliberated on that day and the next, and it returned its verdicts on the following Monday, January 7, 1991. After the conclusion of the penalty phase, at which the jury returned the penalty verdict of death, defendant moved for a new trial, assigning as one of the grounds the trial court's adjournment of the proceedings between December 20, 1990, and January 2, 1991. Arguing that this was reversible error, defendant relied on the then recent decision of the Court of Appeal in *People v. Santamaria* (1991) 229 Cal.App.3d 269 [280 Cal.Rptr. 43]. The trial court denied the motion for a new trial.

Defendant contends that the trial court committed prejudicial error and denied him his constitutional right to due process of law by permitting the jury to interrupt its deliberations for 13 days. We reject this claim.

Because defendant did not object to this suspension of deliberations, the claim is not preserved for appellate review. (*People v. Ochoa* (2001) 26 Cal.4th 398, 440 [110 Cal.Rptr.2d 324, 28 P.3d 78].) Defense counsel not only failed to object to the suspension of deliberations, he opposed the prosecutor's suggestion that the jury be given the option to deliberate on Friday, December 21, 1990. Disregarding Fridays, the suspension of deliberations included only four court days (December 24, 26, 27, and 31), and

these occurred during a traditional holiday period when jurors were likely to be particularly inconvenienced by court duties. (See *People v. Johnson* (1993) 19 Cal.App.4th 778, 790-792 [23 Cal.Rptr.2d 703] [no reversible error where trial court interrupted jury deliberations for 17 calendar days, including nine court days, during December holidays]; *Hamilton v. Vasquez* (9th Cir. 1994) 17 F.3d 1149, 1159 [no denial of due process where trial court interrupted jury deliberations for 18 calendar days during December holidays].) The trial judge noted that the adjournment was for the convenience of the jurors, not for the judge's personal convenience, and that the judge would be at court and working on other matters on each court day. (See *Stroud v. Superior Court* (2000) 23 Cal.4th 952, 970-971 [98 Cal.Rptr.2d 677, 4 P.3d 933].) The trial court did not abuse its discretion in suspending deliberations for a relatively short time during the holiday season for the jurors' convenience.

### M. *Prosecutorial Misconduct*

Defendant contends that the prosecutor committed misconduct by stating or implying to the jury, without having any evidence to prove these allegations, that defendant had stolen victim Pedersen's wallet and credit cards at the time of the killing. He claims this misconduct violated his rights to jury trial and due process of law under the federal Constitution. We conclude that defendant has failed to preserve the issue for appellate review.

"It is improper for a prosecutor to ask questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist." (*People v. Warren* (1988) 45 Cal.3d 471, 480 [247 Cal.Rptr. 172, 754 P.2d 218]; accord, *People v. Osband, supra,* 13 Cal.4th at p. 695; *People v. Bittaker* (1989) 48 Cal.3d 1046, 1098 [259 Cal.Rptr. 630, 774 P.2d 659]; see also *U.S. v. Elizondo* (7th Cir. 1990) 920 F.2d 1308, 1313.) "But if the defense does not object, and the prosecutor is not asked to justify the question, a reviewing court is rarely able to determine whether this form of misconduct has occurred. [Citation.] Therefore, a claim of misconduct on this basis is waived absent a timely and specific objection during the trial." (*People v. Price* (1991) 1 Cal.4th 324, 481 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

In his opening statement, the prosecutor, after describing how defendant stabbed Pedersen to death, made these statements: "He [defendant] then gathered up the property of Mr. Pedersen. His wallet was never found. He use [*sic*] to carry a folding wallet. He gathered up some other property, credit cards that were never found. He gathered some jewelry. Some of the jewelry was never found, and he went down the street."

During direct examination of prosecution witness Inspector Arthur Gerrans, a sergeant assigned to the homicide detail of the San Francisco Police Department, the prosecutor asked: "When you were at the scene of this particular homicide, were you made aware of the fact that—from your observations there, and from talking to people, that Mr. Pedersen's wallet was not found and was missing, and some jewelry?" The witness answered, "That's correct." But the trial court struck the answer after sustaining defense counsel's objection that the question called for hearsay.

The prosecutor then asked, "Were you able to recover Mr. Pedersen's wallet there?" The trial court overruled a defense objection that the question assumed a fact not in evidence, and the witness answered, "We never located his wallet." The prosecutor then asked, "How about credit cards?" Without objection, the witness answered, "We never located his credit cards."

Later, on cross-examination, the witness stated that one of Pedersen's credit cards was found in a drawer in Pedersen's bedroom, and that receipts for other credit cards were found in the same room, but the other credit cards were not found.

During argument to the jury at the guilt phase, the prosecutor said: "First of all, he [defendant] killed him [Pedersen] for his money. We never found his wallet, never found his wallet. We don't know how much money he had, but if you're going around to bars or places like that, you're going to have some money. Don't know how much. Never found his wallet. And that's what he did, and after killing him, he filled up his bag and took what he could take and carry."

A jury could reasonably infer that defendant took Pedersen's wallet and credit cards if those items disappeared from Pedersen's apartment on the night of the killing. Defendant argues, however, that the jury could not properly draw the inference here, and the prosecutor could not properly urge the jury to draw the inference here, because some of the necessary facts were never proven. The prosecution did not present evidence at trial that Pedersen had ever owned a wallet, nor did the prosecutor present evidence that Pedersen's apartment was thoroughly searched after his body was discovered.

The gaps in the prosecution's evidence do not establish prosecutorial misconduct. To establish misconduct, the defense must show, first, that the defense objected at trial on the ground that the prosecutor lacked a good faith belief that Pedersen had owned a wallet and credit cards that disappeared at the time of the murder, and that the prosecutor did not have

evidence to prove those facts. Here, we find in the record no specific defense objection on this ground. When the prosecutor was questioning Inspector Gerrans about the wallet and credit cards, defense counsel objected to certain questions on the grounds of hearsay and assuming facts not in evidence, but the defense did not object that the prosecutor was engaging in misconduct by implying facts the prosecutor was unable to prove. Because there was no specific objection on this ground, the issue is not preserved for appellate review.

## IV. ISSUES RELATED TO PENALTY

### A. *Jury Request for Written Penalty Instructions*

On March 4, 1991, after both parties had presented evidence at the penalty phase, the trial court orally instructed the jury regarding the penalty determination. The court told the jurors that these instructions would be made available to them in written form for their deliberations, and it cautioned them regarding the proper use and consideration of written instructions. The jury began its deliberations immediately after receiving the oral instructions.

The appellate record contains a note signed by the jury foreperson and dated March 4, 1991, requesting "the jury instructions." The clerk's minutes for that date do not mention the note. The reporter's transcript does not record any discussion of the note by the court or counsel, but the clerk's transcript includes a packet of written jury instructions with a cover sheet stating "Instructions given and delivered to jury during deliberations." The cover sheet has a file stamp with a date of March 11, 1991, the day on which the jury returned its penalty verdict.

 Based on these facts, defendant contends that the trial court violated his statutory and constitutional rights to have his trial counsel told of the jury's request for written instructions. We disagree.

Because the trial court during its oral instructions had already announced its intention to give the jury written copies of the penalty instructions, the trial court did not violate any statutory or constitutional right of defendant's when it responded to the jury's note by sending the jury the written instructions without further notice to counsel. Defense counsel had an opportunity to object to the procedure, to review the written copies of the instructions, or to make any suggestions concerning the jury's consideration of the instructions. From the record's silence, we infer that counsel had no objection to the proposed procedure. The jury retired to deliberate at 3:28 p.m. on March 4, 1991, and before the daily recess at 4:50 p.m. on that day

the jury foreperson sent a note asking for the written instructions. We infer from the record that the packet of instructions was then given to the jurors, as reflected by the notation on the cover sheet.

Defendant relies primarily on *People v. Dagnino* (1978) 80 Cal.App.3d 981 [146 Cal.Rptr. 129], but that case is distinguishable because there the trial court provided the jury with written copies of all instructions without informing trial counsel or permitting any response. Here, by contrast, trial counsel received notice and had an opportunity to respond.

### B. *Denial of Automatic Motion to Modify Penalty Verdict*

When it denied the automatic motion to modify the penalty verdict of death, the trial court explained the reasons for its ruling with reference to the statutory aggravating and mitigating factors listed in section 190.3. After reciting section 190.3, factor (h) ("Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication"), the trial court said this: "The defendant at most had mild brain damage and some drinks. None of this affects in any way the cold, calculated stabbing of Henry Michael Pedersen in the back. [¶] Moving the body to the bathtub and turning the pillow over to conceal the blood. While in the house, the defendant selected several pieces of jewelry and items of value, and calmly walked away from the home of Michael Pedersen. [¶] The court personally and independently concludes this to be true beyond a reasonable doubt, and is an aggravating factor."

Defendant contends that, because section 190.3, factor (h) may only be mitigating (*People v. Montiel* (1993) 5 Cal.4th 877, 944 [21 Cal.Rptr.2d 705, 855 P.2d 1277]), the trial court erred in finding it to be an aggravating factor in this case. Although susceptible to the interpretation proposed by defendant, the trial court's remarks are not entirely free from ambiguity, and it is possible that what the trial court found to be aggravating was the circumstances of the crime (section 190.3, factor (a)) rather than the absence of mental impairment (section 190.3, factor (h)). In any event, even if we assume the trial court erred in the manner defendant suggests, defendant was not prejudiced by that error.

We do not agree with defendant that on the evidence presented here the trial court was *required* to find that section 190.3, factor (h), had substantial

mitigating value. The evidence was at best conflicting, and the trial court could reasonably conclude that whatever impairment defendant suffered, as a result of brain injury or intoxication, in his ability to appreciate the criminality of his conduct, was relatively slight and insignificant. Defendant's attempt to hide the bloodstains by turning over the couch cushions and carrying the body to the bathtub indicate an appreciation that the killing was wrongful. (See *People v. Weaver* (2001) 26 Cal.4th 876, 990 [111 Cal.Rptr.2d 2, 29 P.3d 103].)

The trial court properly found that the circumstances of the crime, defendant's prior felony convictions, his prior violent acts, and his age were all aggravating factors. (§ 190.3, factors (a)-(c) & (i).) Because there were these four substantial aggravating factors, and the mitigating evidence was relatively insubstantial by comparison, we conclude that the trial court's error, if any, was nonprejudicial. (See *People v. Kaurish, supra,* 52 Cal.3d at p. 718.)

## C. *Constitutionality of Death Penalty Statute*

Defendant contends that various features of California's capital sentencing scheme violate the federal Constitution. As defendant acknowledges, we have previously rejected all but one of these challenges. Thus, we have held: The special circumstances listed in section 190.2 adequately narrow the class of murders for which the death penalty may be imposed (*People v. Kipp, supra,* 26 Cal.4th at p. 1136); section 190.3, factor (a), permitting the jury to consider the circumstances of the capital crime as an aggravating factor, is not unconstitutionally vague or imprecise (*People v. Kipp, supra,* at p. 1137); written jury findings or unanimity as to aggravating circumstances is not constitutionally required (*People v. Lucero* (2000) 23 Cal.4th 692, 741 [97 Cal.Rptr.2d 871, 3 P.3d 248]); intercase proportionality review is not constitutionally required (*ibid.*); the prosecution need not prove aggravating circumstances beyond a reasonable doubt (*People v. Kipp, supra,* at p. 1137); the jury need not find beyond a reasonable doubt that death is the appropriate punishment (*ibid.*); the jury need not be instructed that the prosecution has the burden of proof or that there is a presumption for life (*ibid.*); the jury may consider prior unadjudicated criminal activity under section 190.3, factor (b) (*People v. Kipp, supra,* at p. 1138); jury consideration of a defendant's prior felony convictions under section 190.3, factor (c), does not constitute double jeopardy or violate fundamental fairness (*People v. Lewis, supra,* 25 Cal.4th at pp. 659-661); and the qualifiers "extreme," "substantial," and "reasonably" in section 190.3, factors (d), (g), and (f), do not prevent jury consideration of relevant mitigating evidence (*People v. Kipp, supra,* at p. 1138; *People v. Jenkins, supra,* 22 Cal.4th 900, 1054-1055;

*People v. Stanley* (1995) 10 Cal.4th 764, 842 [42 Cal.Rptr.2d 543, 897 P.2d 481]). We are not persuaded that we should reconsider our previous rulings on these issues.

 Defendant makes one apparently novel claim, which is that our law is invalid because at the penalty phase the defendant may not reopen the issue of his guilt of the capital charges and may present evidence of his innocence only in support of a lingering doubt argument. He suggests that the evidence he presented during the penalty phase here might have caused the jury to entertain a reasonable doubt that robbery was the motive for his killing of Pedersen, rather than anger at a sexual advance by Pedersen or some other idiosyncratic motive. Defendant does not argue, however, that he was precluded from presenting any evidence of his innocence at the guilt phase, nor does he offer authority precluding a death penalty scheme in which the issues of guilt and penalty are determined at separate phases of the trial. We are not persuaded that our law is invalid merely because it does not permit full relitigation of innocence at the penalty phase.

## V. ADDITIONAL ISSUES

### A. International Law

Defendant contends the violations of state and federal constitutional law that he has claimed also constitute violations of international law and that he suffered racial discrimination in violation of international law at his trial. Because defendant has failed to establish prejudicial violations of state or federal constitutional law, we need not consider whether such violations would also violate international law. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Defendant has failed to show racial discrimination in violation of state or federal law, and we are not persuaded that international law prohibits a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. (*Ibid.*; see also *People v. Jenkins, supra,* 22 Cal.4th at p. 1055.)

### B. Cumulative Prejudice

Defendant argues that even if no single error requires reversal of the penalty verdict of death, the cumulative effect of the errors at the guilt and penalty phases must be deemed sufficiently prejudicial to warrant this remedy. Defendant has demonstrated few errors, and we have found each

error or possible error to be harmless when considered separately. Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the judgment.

## VI. Disposition

The judgment is affirmed in its entirety.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.